SHARDLOW v. NEWARK PLANK ROAD CO. See Case No. 9,620.

SHARDLOW v. NEW JERSEY R. CO. See Case No. 9,620.

---

## Case No. 12,708.

### The SHARK.

[Blatchf. Pr. Cas. 215.] 1

District Court, S. D. New York.  Sept., 1862.

PRIZE—VIOLATION OF BLOCKADE—ENEMY PROPERTY—LOYAL OWNER—BRINGING IN CAPTURED CREW.

1. Vessel and cargo condemned for a violation of the blockade, and as enemy property.

2. The master, who was part owner of the vessel, and who was the only witness examined in preparatorio, testified that he was ignorant of the blockade: but the court, on all the facts, *held* that he knew of it.

3. A loyal citizen, or a resident of a loyal state, cannot, with impunity, employ his vessel in trade with the enemy, or in favoring the insurrection.

4. The omission of the captors of a vessel to bring in the captured crew will not inure to defeat a capture by a government vessel.

In admiralty.

BETTS, District Judge. The capture of this vessel and cargo was made by the United

1 [Reported by Samuel Blatchford, Esq.]

States war steamer South Carolina, July 4, 1861, in the Gulf of Mexico, off Galveston bar, the vessel being then in the act of steering into Galveston. The vessel and cargo were sent by the captors to this port for adjudication, and were here libeled as lawful prize August 24th thereafter. A judgment by default was subsequently vacated at the instance of the master of the vessel, and he was permitted to intervene, and file his claim and answer in the suit, and contest the case before the court on the proofs in preparatorio. The master having been examined before the prize commissioners, and his evidence being offered by the district attorney on the hearing in court, the testimony previously taken, on the order of the court, of a witness not on board of the captured vessel, was, on the motion of the proctor for the claimant, excluded, and the case was heard solely upon the papers found on board of the vessel and the examination in preparatorio of her master.

The vessel was built in Portsmouth, New Hampshire, under the direction of the master, in November, 1860, for the other two owners, resident in Galveston, and was taken thence by the master in January, 1861, and, by agreement at that place with them, the master became joint owner with them of the vessel. She was enrolled, on the oath of ownership made by the master and claimant, at the customhouse in Galveston, January 16, 1861, the master swearing that he owned one-fourth, Theodore Holmes three-eighths, and R. Jameson three-eighths, and that all the owners were residents of Galveston. She was licensed to him on the same proof. The enrollment and license were not changed to the time of her capture.

The master intervened and claimed the vessel for all the owners, and the cargo as carrier for the shippers. On his examination in preparatorio, he testifies that he took title to one-fourth of the vessel merely to secure his advances in building and fitting her, and took and retained command of her from the time she was launched with that object. He also swore that he was a resident of New York, and never had been of Galveston.

The vessel, when arrested, was on a voyage to Galveston, from the port of Berwick, Louisiana. The cargo was shipped by Wakefield & Wilder, agents for residents or owners in New Orleans or Berwick, one of whom was on board at the time, consigned to various persons at Galveston. No one intervened as owner of the cargo. It consisted, as appears on the manifests and bills of lading, of miscellaneous articles, malt, hops, sugar, salt, medicine, coils of rope, whiskey, cigars, bagging, etc. Louisiana seceded from the Union January 26, 1861, and Texas passed its secession ordinance March 4th, thereafter. The ports of Louisiana and Texas were declared to be under blockade by the president's proclamation of April 19, 1861 [12 Stat. 1259], and more than two months after that this vessel and cargo were seized in the act of making

the port of Galveston, with the intention, as the captain testifies, to enter that port, having left the port of Berwick, in Louisiana, for that purpose. In this attempt the vessel was intercepted and captured by a vessel of war on blockade duty off the port. The master testifies, on his examination, that he had no knowledge or notice of the blockade. Very possibly he may not have received direct personal and reliable notice of any actual blockade already carried into effect, but he had heard that the United States steamer Brooklyn was blockading New Orleans at the Southwest Pass. It has appeared before the court, in the progress of these prize suits, that commanding officers of the navy had assigned and stationed ships of war to the duty of blockading ports on the Gulf of Mexico, along our southern coast, about the middle of June, 1861, and the master says that he had, previous to his arrest, made several voyages along the coast of Texas, to the different ports, with cargoes of corn, flour, country produce, and merchandise. The court is also judicially apprised that the United States war vessels were active in endeavoring to enforce the blockade, by repeated seizures within the period during which this vessel was probably so employed. These facts, coupled with the knowledge avowed by the master, that a blockading ship was then lying before the mouth of the Mississippi, but a few miles, topographically, from Berwick bay, and with his practice of conveying cargoes to and from New Orleans by the way of Berwick bay, and an intermediate transportation, by railway, of eighty miles (not by inland navigation, by canal or other water course), afford a very strong presumption that this course of business was favored because of the hazards of exposure to blockading cruisers expected to be hovering outside, and that the danger of such exposure could not have escaped the notice of the claimant. I shall, at all events, hold the circumstances sufficiently impressive to require the corroboration of further evidence than the bald assertion of a part owner of the vessel, to satisfy me of his real ignorance of facts liable to be of general notoriety, and which immediately affected his personal interests and employments. Should he deem it important to offer further proofs to this particular, the court will be ready to listen to an application on his behalf to that end; otherwise, I shall consider the circumstances as sufficiently importing notice to a person so connected as he was with the coasting trade along that exact territory, that the government were enforcing the blockade there, and as showing also that he was knowingly concerned in attempts to evade it. This would render him guilty of the double acts of running the blockade out of Berwick bay, and of endeavoring to evade it in making an entrance into a port of Texas.

But, under the facts in proof in the case, it is of slight importance whether the vessel was technically guilty of a violation of blockade or not. Nor in this case is it of any particular moment to determine whether Patterson is a loyal subject and an actual resident of the city of New York, because he could not, in these capacities, with impunity, employ his vessel in trade with the enemy, or in favoring the insurrection. His property would, in either alternative, be subject to confiscation therefor, both by the laws of prize and the statutory law, and irrespective of his ignorance of the law. 12 Stat. 319; 1 Chit. Law Nat. c. 1; 1 Kent, Comm. 66, and notes; The Hoop, 1 C. Rob. Adm. 196. So, also, the whole of the cargo, and certainly three-fourths of the vessel, were enemy property, and therefore confiscable as prize of war wherever apprehended at sea. The vessel was owned in Texas, and the cargo in Texas or Louisiana, and both were in a course of sea transportation, in the use and for the benefit of the enemy. The title made on the oath of the claimant, at the enrollment of the vessel, is all vested in declared residents of Texas. The verbal assertion of the claimant in his preparatory proof will not overbear the proofs in the ship's papers—the enrollment and license—that she belonged to Galveston. Moreover, if she had been nominally transferred to a loyal citizen or a neutral friend, and was still permitted to continue in the enemy's trade, she would be also liable to condemnation for that cause. The Vigilantia, 1 C. Rob. Adm. 2; The Princessa, 2 C. Rob. Adm. 51.

The irregularity on the part of the captors in omitting to bring in with the vessel and cargo the crew captured on board, will not inure to defeat the capture by a government vessel. The laches of the officers or crew in conducting the public service cannot defeat the rights acquired by the nation by the seizure. It might be different in case of an arrest by private cruisers.

A decree of condemnation of vessel and cargo must be rendered on both grounds.